# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____

MICHAEL R. BARBER,

Appellant,

v.

MANATEE MEMORIAL HOSPITAL,
LIMITED PARTNERSHIP,

Appellee.

No. 2D22-3459

_____

March 22, 2024

Appeal from the Circuit Court for Manatee County; Edward Nicholas, Judge.

Michael P. Milton and A.J. Hernandez of Milton, Leach, Whitman, D'Andrea & Eslinger, P.A., Jacksonville; and Lucreita D. Becude of Lucreita D. Becude, P.A., Jacksonville, for Appellant.

Jeffrey L. Blostein, Alexandra Hershorn, and Jay Cohen of Cohen, Blostein & Ayala, P.A. n/k/a Cohen & Blostein, P.A., Fort Lauderdale, for Appellee.


SLEET, Chief Judge.

Michael Barber challenges the trial court's final summary judgment entered in favor of Manatee Memorial Hospital in Barber's medical negligence action against the hospital. This appeal involves the

application of the doctrine of res ipsa loquitur to a medical negligence action wherein Barber sustained bilateral hip fractures while unconscious in the Manatee Memorial intensive care unit (ICU), where he was being treated for a drug overdose.  We conclude, based on the facts of this case, that Barber was entitled to assert res ipsa loquitur below and that the application of that doctrine creates a genuine dispute of material fact as to whether Barber's unexplained bilateral hip fractures were the result of Manatee Memorial's negligence.  Accordingly, the trial court erred in entering summary judgment, and we reverse and remand for further proceedings.  We further conclude that the trial court erred in granting Manatee Memorial's motion in limine to exclude evidence of its failure to investigate the cause of Barber's unexplained injuries once they were discovered.  If this case does proceed to trial, such evidence is admissible.

FACTS

On September 23, 2017, Barber, who was thirty-six years old at the time, attempted to end his life by taking four different prescription medications while at home.  Fortunately, he had a change of heart and called 911.  When emergency medical technicians (EMTs) responded, they found Barber in his garage pacing back and forth and smoking a cigarette.  During the EMTs' assessment, Barber began to have "seizure like activity," but according to the Manatee County Emergency Medical Services (EMS) patient record, the seizure activity lasted less than thirty seconds and Barber had "purposeful movement during [the] event."  The Manatee Memorial Hospital History and Physical Report prepared by Dr. Victor Ghobrial—the physician who would later admit Barber to the hospital—indicates the following: "EMS notes upon their arrival the patient was walking . . . but became lethargic en route to the [emergency

2

department].  EMS states the patient also had a possible seizure and became responsive to an ammonia inhalant."  The lead EMT testified at deposition that at his home, Barber walked over to and got up on the EMS gurney without assistance.

Barber was taken to the emergency department at Manatee Memorial.  While there, Barber submitted to a psychiatric consultation.  The notes from that consultation indicate that "[patient] walked from stretcher to ER stretcher."  Dr. Ghobrial's Hospital History and Physical Report repeats that fact.  The emergency department notes do not contain any indication that Barber complained of pain of any kind but do specifically state that the results of a musculoskeletal exam showed a normal range of motion, which a Manatee Memorial nurse testified at deposition referred to both upper and lower extremities.

However, within four hours of arriving, Barber's condition deteriorated rapidly; he became nonresponsive, and medical staff sedated him, intubated him, put him on a ventilator, sent him for CT scans, and then transferred him to the ICU.  He remained under observation in the ICU in a low position hospital bed equipped with an alarm and soft wrist restraints for the next fifty-five hours.  Hospital records show that during that time, Barber's vitals were continuously monitored and there were no complications, with specific notations from September 24, 2017, stating "[a]ppropriate body movements" and "[m]oves all extremities equally." According to hospital records, Barber's stay in the ICU was uneventful, and nothing in the records suggest hip problems or seizure activity while he remained unconscious.[1]

_____

[1] We do note that an entry in Barber's hospital record dated September 24, 2017, at 5:50 p.m. indicated "mild seizure activity" while "patient [was] returning from MRI."  But the hospital declared this report

3

At 1:05 p.m. on September 25, 2017, Barber was successfully extubated and remained in bed with suicide precautions in place, but his wrist restraints were removed. At 5:34 p.m., he was transferred with assistance to a bedside chair. At that time, he began to complain of pain in his right groin and thigh that felt like a "big cramp." He was sent for x-rays, and while in the x-ray room, he complained of extreme pain and resisted when two assistants lifted him to place him on the x-ray board. Barber's right leg was noted to be "turned outward," and he was diagnosed with bilateral hip fractures.[2] Barber underwent surgery at Manatee Memorial to repair his hip fractures, but no hospital personnel ever explained to him how his hips were injured.

PROCEDURAL HISTORY

In 2018, when Barber's counsel notified the hospital of his claim, the hospital responded that it had no record of any incident or report concerning the cause of his hip injuries. Thereafter, Barber complied with all statutory prerequisites for notice of intent to bring a medical malpractice claim, and the hospital completed its presuit investigation. In his August 20, 2019, one-count amended complaint, Barber alleged medical negligence on the part of Manatee Memorial. Although Barber did not reference the doctrine of res ipsa loquitur in this, the operable complaint, he did allege the following:

> [O]n September 23, 2017, he walked into the hospital unassisted with no complaints of any femoral or acetabular problems, but when he awoke on or about September 26, 2017, the fractures to his proximal femur and acetabulum were grossly evident. Neither the Defendant's agents,

to be an "Error Report-Charted Wrong Patient," and Manatee Memorial does not dispute that this record entry was not referencing Barber.

[2] These injuries are also referred to in the record as a fracture of the right femoral neck and a fracture of the left acetabulum.

4

servants, nor employees ever advised Plaintiff of any trauma suffered while he was in Defendant's custody and care or provided any explanation for his femoral or acetabular injuries despite Plaintiff's pleas for an explanation since he had been totally unconscious for two and one-half (2 1/2) days; and it was obvious that he had been injured while under the care of the Defendant.

Both parties conducted extensive discovery and retained qualified experts within the same medical fields as the medical providers who had treated Barber at Manatee Memorial. Having no hospital records documenting any incident or event that could have caused Barber's injuries, all medical experts were left to rely upon their collective medical skill, expertise, and knowledge as well as literature concerning the most common causes of bilateral hip fractures.

After the bulk of medical discovery was completed, Manatee Memorial filed a motion for summary judgment as a matter of law, arguing that Barber had "failed to meet his burden of proof and . . . to put forth sufficient evidence in order to prove his medical negligence claim" because his "experts could not testify within a reasonable degree of medical probability that the healthcare providers at Manatee Memorial caused 'trauma' to this patient resulting in his fractures." It maintained that "[t]here has been no record evidence to date demonstrating that the nurses, physicians, techs, etc. at the hospital somehow caused trauma to Mr. Barber as to cause a double hip fracture while he was a patient at the hospital" but that it had presented evidence that the fractures were caused by an "unwitnessed seizure."

Manatee Memorial also acknowledged that Barber may argue the doctrine of res ipsa loquitur. However, the hospital argued that he could not avail himself of the common law application of the doctrine because he could not establish that his injuries were the type that could only

have been caused by negligence where his experts "acknowledged that these types of fractures can result from falls from multiple story buildings, a fall out of bed, or the patient getting out of bed on his own."

Barber opposed Manatee Memorial's summary judgment motion by pointing out that the hospital's own experts acknowledged that his hip fractures occurred while he was under the hospital's care. With regard to the hospital's contention that he must have suffered an unwitnessed seizure, Barber submitted the testimony of his expert witness, who stated that it was his opinion Barber did not suffer a seizure and that severe bilateral hip fractures do not ordinarily occur to a sedated, unconscious ICU patient absent negligence. Barber maintained that because Manatee Memorial had failed to document any specific trauma or other cause of his hip fractures, he was entitled to argue to the jury a res ipsa loquitur theory of negligence and that the jury, as the trier of fact, should resolve the genuinely disputed material issue of whether his hip fractures were caused by the negligence of Manatee Memorial.

Following a summary judgment hearing, the trial court granted Manatee Memorial's motion, concluding that Barber "had failed to put forth sufficient evidence that [his] inexplicable injuries were the result of negligence on the part of" Manatee Memorial. Noting that Barber had alleged in his complaint that his injuries "were the result of some violent trauma he was caused to experience by the negligence of [Manatee Memorial's] agents, servants and/or employees," the court concluded, "The problem, however, quite simply, is that there is no evidence of same."

On appeal, Barber first argues that the trial court erred in granting summary judgment in Manatee Memorial's favor because he satisfied the criteria necessary to argue a res ipsa loquitur theory of negligence and

that such a theory created a disputed issue of material fact that precluded the entry of summary judgment. We agree.

SUMMARY JUDGMENT

We review a trial court's granting of summary judgement de novo. *Volusia County v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000); *Sanders Farm of Ocala, Inc. v. Bay Area Truck Sales, Inc.*, 235 So. 3d 1010, 1012 (Fla. 2d DCA 2017). Pursuant to Florida Rule of Civil Procedure 1.510(a), the trial court should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] Accordingly, the initial burden is on the movant to establish the absence of any genuinely disputed material fact. *Id.*; *see also Brevard County v. Waters Mark Dev. Enters.*, 350 So. 3d 395, 398 (Fla. 5th DCA 2022) ("The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))). "If the movant does so, then the burden shifts to the [nonmoving] party to demonstrate that there are genuine factual disputes that preclude judgment as a matter of law." *Waters Mark Dev. Enters.*, 350 So. 3d at 398. Under rule 1.510(a), "the correct test for the existence of a genuine factual dispute is whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Carter v. Blue House Painting & Remodeling, LLC*, 367 So. 3d 618, 619 (Fla. 2d DCA 2023) (quoting *In re Amends. to Fla. Rule of Civ. Proc. 1.510*, 317 So. 3d 72, 75 (Fla. 2021)); *see also Pio v. Simon Cap. GP*, 366 So. 3d 1200, 1203 (Fla.

---

[3] The final summary judgment was entered on September 12, 2022. Accordingly, the amended version of rule 1.510 that went into effect on May 1, 2021, is applicable.

7

2d DCA 2023) ("Courts must be particularly restrained in granting summary judgment in negligence cases[,] and summary judgment should not be granted 'unless the facts are so crystallized that nothing remains but questions of law.' " (quoting *Grimes v. Fam. Dollar Stores of Fla., Inc.*, 194 So. 3d 424, 428 (Fla. 3d DCA 2016))).

In the instant case, Manatee Memorial met its initial burden of showing that the record below lacked any evidence of any specific act of negligence on the part of the hospital, its agents, or its employees that could have caused Barber's bilateral hip fractures. The elements of a medical negligence cause of action are (1) duty, (2) breach of that duty, (3) causation, and (4) damages. *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 981 (Fla. 2018). Here, Manatee Memorial correctly argued at summary judgment that Barber had presented no specific evidence of the breach and causation elements of his negligence claim.

Consequently, the burden shifted to Barber to demonstrate the existence of a genuinely disputed fact upon which a jury could find that one or more agents or employees of Manatee Memorial committed an act of negligence that resulted in his injuries. To meet his burden, Barber presented expert witness testimony and relied on the doctrine of res ipsa loquitur, which is Latin for "the thing speaks for itself." *See Marrero v. Goldsmith*, 486 So. 2d 530, 531 (Fla. 1986). The trial court, however, ruled that Barber could not avail himself of that evidentiary doctrine and granted summary judgment in favor of Manatee Memorial. This was error.

### Res Ipsa Loquitur

Under certain circumstances, plaintiffs in negligence cases may use the doctrine of res ispa loquitur as "a common-sense inference of negligence where direct proof of negligence is wanting." *Goodyear Tire &*

*Rubber Co. v. Hughes Supply, Inc.*, 358 So. 2d 1339, 1341 (Fla. 1978). The doctrine "is a rule of evidence that permits, but does not compel, an inference of negligence . . . . 'Under it an inference may arise in aid of the proof.' " *Marrero*, 486 So. 2d at 531 (quoting *Yarbrough v. Ball U-Drive Sys., Inc.*, 48 So. 2d 82, 83 (Fla. 1950)). The case law is clear that the doctrine only creates an inference and that while "[n]egligence may not be presumed, . . . where direct proof is wanting and such circumstances are shown as to leave no conclusion except that the defendant was at fault, a prima facie case may arise, justifying the application of the rule of res ipsa loquitur." *W. Coast Hosp. Ass'n v. Webb*, 52 So. 2d 803, 804 (Fla. 1951).

"The hospital patient relationship is one area where the application of the doctrine . . . has been utilized to prevent injustice." *Keyes v. Tallahassee Mem'l Reg'l Med. Ctr.*, 579 So. 2d 201, 203 (Fla. 1st DCA 1991). However, a plaintiff may only invoke the doctrine under very limited circumstances. *See Goodyear*, 358 So. 2d at 1341 ("Res ipsa loquitur . . . is a doctrine of extremely limited applicability." (footnote omitted)); *Marrero*, 486 So. 2d at 531 (explaining that the rule permits an inference of negligence only "under certain circumstances"). And the burden is on the plaintiff to present sufficient evidence upon which the jury, as the finder of fact, could find the existence of those circumstances. *See Goodyear*, 358 So. 2d at 1342 (explaining that in determining whether a plaintiff may argue res ipsa loquitur, the trial court must ask, "Can it realistically be concluded . . . that this 'happening' does not ordinarily occur in the absence of negligence by the [defendant]?" and that "[t]he initial burden is on the plaintiff to establish that the circumstances attendant to the injury are such that . . . negligence is the probable cause and the defendant is the probable

actor"). When a plaintiff meets that burden, "the doctrine of res ipsa loquitur is applicable, and the issue of the hospital's negligence should be submitted to the jury" with the proper jury instruction. *See Troupe v. Evans*, 366 So. 2d 139, 140-41 (Fla. 1st DCA 1979) (citing *Webb*, 52 So. 2d 803).

Specific to medical negligence cases like the instant one, a plaintiff must present evidence from which a jury could conclude "that the injury was unrelated to the surgical procedure or other medical treatment" that the defendant was legitimately providing the plaintiff. *Borghese v. Bartley*, 402 So. 2d 475, 477 (Fla. 1st DCA 1981); *cf. Webb*, 52 So. 2d at 804 ("[R]es ipsa loquitur is inappropriate in a matter involving a physician's exercise of skill."); *Marshall v. Stein*, 662 So. 2d 720, 722 (Fla. 4th DCA 1995) ("[P]laintiff's injury was directly related to the anesthesia, and the anesthesia was an integral part of her operation. Accordingly, . . . res ipsa [loquitur] is not available to plaintiff.").[4] But the parties do not dispute that Barber's bilateral hip fractures were completely unrelated to his medical treatment for his attempted overdose. Consequently, we need not further discuss this first criterion.

---

[4] In its order on summary judgment, the trial court quotes section 766.102(3)(b), Florida Statues, without explanation or analysis of how it pertains to this case. But that statute is inapplicable to the instant case as the statute's reference to "medical injury" limits its application to injuries "sustained as a direct result of medical treatment or diagnosis." *Borghese*, 402 So. 2d at 477. In cases such as the instant one where "a plaintiff establishes that the injury is outside the scope of medical treatment or diagnosis," if the plaintiff can establish that "the facts and 'circumstances attendant to the injury are such that . . . negligence is the probable cause and the defendant is the probable actor,' the doctrine of res ipsa loquitur is applicable" under the common law. *Id.* (quoting *Chenoweth v. Kemp*, 396 So. 2d 1122, 1125 (Fla. 1981)).

Additionally, to be entitled to argue res ipsa loquitur to the jury, a plaintiff must present sufficient evidence that "the instrumentality causing his or her injury was under the exclusive control of the defendant" and that the incident causing the injuries would not ordinarily occur "without negligence on the part of the one in control." *Marrero*, 486 So. 2d at 531 (quoting *Goodyear*, 358 So. 2d at 1341-42).

### Exclusive Control

In its summary judgment order, the trial court made two observations in concluding that Barber had provided insufficient evidence of Manatee Memorial's exclusive control. First, the court stated that "most, if not all," of Barber's expert witnesses could not rule out that his injuries might have occurred outside the hospital.

The trial court seems to ignore, however, that Manatee Memorial's own expert Dr. Edward Lassiter opined that Barber sustained his injuries "in the hospital" while he was unconscious and in the exclusive control of the hospital. It is true that both parties' experts had to agree that there was some possibility that Barber sustained the injuries before he arrived at the hospital, but that is because there is simply no explanation for Barber's fractures. However, both parties' experts also agreed that it was more probable that the injuries occurred while Barber was in the hospital. This evidence was sufficient to satisfy Barber's burden, which at this point in the proceedings is only "to establish that the circumstances attendant to [his] injur[ies] are such that . . . negligence is the *probable* cause and [Manatee Memorial] is the *probable* actor." *See Goodyear*, 358 So. 2d at 1342 (emphasis added).

Moreover, the record evidence established that Barber was walking around his garage when EMS arrived, that he walked to and got on the EMS gurney without assistance before being transported to the hospital,

and that a musculoskeletal exam conducted in the emergency department indicated a normal range of motion of Barber's upper and lower extremities. All of this, coupled with the report that EMS informed hospital personnel that he "walked from [EMS] stretcher to ER stretcher," amounted to competent evidence from which a jury could conclude that Barber's injuries occurred while he was a patient at Manatee Memorial.

Second, the trial court noted that nothing in Barber's medical records indicated the mechanism that caused his injuries or the manner in which the injuries occurred. Although it is true that neither party's experts were able to offer any definitive opinions as to the mechanism that caused Barber's injuries and that there was no evidence of a documented fall or other incident that could have caused Barber's injuries, the court's reasoning in this regard exhibits a fundamental misunderstanding of the exclusive control requirement.

To argue res ipsa loquitur, a plaintiff is "not required to establish the identity of the instrumentality that caused [the] injury; rather the . . . doctrine merely requires 'that the instrumentality causing [the plaintiff's] injury was under the exclusive control of the defendant.' " *Soltwisch v. Pasco County*, 33 So. 3d 85, 87 (Fla. 2d DCA 2010) (second alteration in original) (quoting *Goodyear*, 358 So. 2d at 1341). "[I]t is the exclusivity of the defendant's control that permits an inference of negligence under the doctrine, not the identity of the instrumentality itself." *Id.* (concluding that exclusive control by the county was established by evidence that a "semi-responsive" plaintiff underwent a normal physical examination with no hip injuries before he left a clinic in a county ambulance but then arrived at the hospital with acute hip fractures); *see also Webb*, 52 So. 2d 804 (concluding that all prerequisites necessary for the inference were met, including that "the instrument that caused [plaintiff's] injury

12

was in the absolute control of the personnel of the institution," where plaintiff was unconscious in a diabetic coma and "did not know and could not have known what apparatus was used in injuring her" but "there [wa]s abundant proof that [she] was injured while in the hospital").

Accordingly, because Barber presented sufficient evidence from which the jury could conclude that Manatee Memorial had exclusive control over Barber while he was unconscious in the ICU for fifty-five hours, Barber has met his burden of establishing this res ipsa loquitur prerequisite.

<u>Injuries Would Not Ordinarily Occur Absent Negligence</u>

The trial court also misunderstood the final res ipsa loquitur prerequisite—that the injuries would not ordinarily occur absent the defendant's negligence. In its order, the court concluded that "in the absence of clear evidence of negligence on the part of the healthcare provider, no . . . inference [of negligence] is permitted." In doing so, the court came to the illogical conclusion that to be entitled to an inference that there was negligence on the part of the defendant, a plaintiff has to provide evidence that there was negligence on the part of the defendant. But if the plaintiff had evidence of the defendant's negligence, the inference would not be necessary. And in fact, "one may not avail himself of the doctrine if he proves specific negligence." *See Webb*, 52 So. 2d at 804; *see also Marrero*, 486 So. 2d at 532 ("[W]hen a plaintiff can introduce enough direct evidence of negligence [it] dispel[s] the need for the inference."). Rather, the question the trial court should have considered is "whether that which occurred is a phenomenon which does not ordinarily happen except in the absence of due care." *See Goodyear*, 358 So. 2d at 1342.

13

Here, Manatee Memorial's own experts opined that the most common causes of bilateral hip fractures are falling from the height of a three-story building or being involved in a severe motor vehicle accident and that such injuries do not normally happen to an unconscious ICU patient.

In fact, res ipsa loquitur is often invoked out of necessity in cases like this where a previously sedated and unconscious patient wakes up in a hospital with a new injury that is unrelated to their treatment and where there is little to no direct evidence of negligence proving who or what caused the injury. *See Keyes*, 579 So. 2d at 203. "The unconscious patient is entitled to an explanation concerning an injury and is, thus, in many cases, entitled to the inference created by the doctrine." *Id.* (citing *Marrero*, 486 So. 2d at 533; *Borghese*, 402 So. 2d at 477). Res ipsa loquitur opens the courthouse doors to patients who, like Barber, submit themselves to the care of medical professionals, suffer unexplained and unrelated injuries, and lack any direct evidence of causation. *See Marrero*, 486 So. 2d at 533; *cf. McDonald v. Med. Imaging Ctr. of Boca Raton*, 662 So. 2d 733, 735 (Fla. 4th DCA 1995) (rejecting the application of res ipsa loquitur where plaintiff "was not unconscious when her injury occurred, there was no mystery as to how the injury occurred, and there was only one possibly culpable [individual]").

> Without the aid of the doctrine [of res ipsa loquitur,] a patient who received permanent injuries of a serious character, obviously the result of some one's [sic] negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability.

*Marrero*, 486 So. 2d at 533.

In the instant case, expert testimony established that Barber's injuries are not the type that result from lying unconscious in an ICU

14

bed recovering from a drug overdose. Put another way, he presented sufficient evidence for a jury to reasonably conclude that under the circumstances, injuries like his would not occur absent negligence.

<u>An Unwitnessed Seizure</u>

To refute both that the hospital was in exclusive control of the instrumentality that caused Barber's injuries and that his injuries were the type that could only occur as a result of negligence, Manatee Memorial advances the theory that Barber suffered "an unwitnessed tonic-clonic seizure" while in the hospital and that his bilateral hip fractures were caused by that seizure. The hospital's experts pointed to the EMS record of "seizure like activity" during the initial assessment at Barber's home as evidence that he must have had another seizure during the fifty-five hours he was unconscious in the ICU—a seizure that no hospital personnel documented witnessing. The irony is that, in some sort of inverse res ipsa loquitur argument, Manatee Memorial wants this previous seizure-like activity—which reportedly lasted less than thirty seconds—to be "the thing that speaks for itself" to provide an inference that Barber later suffered a seizure of such magnitude that it caused bilateral hip fractures <u>in the absence of any other proof</u>.

Such a conclusion is based on nothing but pure speculation. Could Barber have suffered a violent seizure that no hospital personnel documented even though he was being constantly monitored in the ICU? Of course, anything is possible. But "[t]he mere possibility that [the injury] could have occurred without negligence does not defeat a party's entitlement to a[ jury] instruction on res ipsa loquitur. The proper test is whether the [injury] would have occurred without negligence on the part of the defendant *in the ordinary course of events*." *Keyes*, 579 So. 2d at 204 (emphasis added).

Here, not only do both parties' experts agree that there is no documented medical evidence to prove that Barber suffered a seizure while in the hospital, but such seizures alone would not ordinarily result in the injuries that Barber suffered. According to the medical experts, tonic-clonic seizures are severe and violent, usually last for between three and five minutes, and involve intense stiffening and rhythmic jerking. Expert testimony indicated that although this form of seizure may cause violent movements of the lower extremities, absent a fall, they mostly cause only upper extremity injuries. And one of Manatee Memorial's experts, Dr. Bolanle Adamolekun, specifically testified that only "around 0.3 percent" of seizures result in bone fracture absent a fall.

Additionally, Barber presented expert medical testimony rebutting the unwitnessed seizure theory. His experts opined that within a reasonable degree of medical probability, Barber either fell or was dropped while in the exclusive care and custody of the hospital and that injuries as severe as his bilateral hip fractures could not occur under those conditions absent negligence on the part of Manatee Memorial.

Further, Barber's experts asserted that if Barber had suffered a tonic-clonic seizure, the violent convulsions would have caused tachycardia and respiratory distress, he likely would have voided his bowels and bladder, and alarms would have been triggered to alert the hospital's staff as his vital signs were being constantly monitored in the ICU. And a hospital nurse monitoring Barber testified that the nurse's charge station is located so that the ICU nurses "can certainly hear anything that happens pretty much from anywhere in the ICU unit." But despite all of this, the hospital's records for the period that Barber was unconscious in the ICU do not reveal any such changes in his vital signs or that any alarms were triggered. There is simply no evidence that

Barber suffered an unwitnessed seizure violent enough to result in these injuries.

Accordingly, Barber satisfied all the prerequisites to avail himself of the doctrine of res ipsa loquitur, and the trial court erred in placing the burden upon Barber to prove direct evidence of Manatee Memorial's negligence. The lack of direct evidence of negligence is not fatal to Barber's case; it is what makes it a res ipsa loquitur case. Requiring Barber to introduce evidence that would prove negligence would be to require him to defeat his own res ipsa loquitur claim.

Because the record evidence establishes that Barber's hip fractures were unrelated to his treatment for a drug overdose, that Manatee Memorial was in exclusive control of the instrumentality that caused his fractures, and that his fractures would not ordinarily occur absent negligence, Barber is entitled to argue res ipsa loquitur to the jury and have the jury instructed on a res ipsa loquitur inference of negligence. This inference creates a genuine dispute as to the material fact of whether Manatee Memorial breached a duty of care owed to Barber causing Barber's injuries. As such, summary judgment was improper.

MOTION IN LIMINE

Barber also argues on appeal that the trial court erred in granting Manatee Memorial's motion in limine to exclude evidence of its failure to investigate the cause of Barber's injuries once they were discovered. Again, we must agree with Barber.

Manatee Memorial moved in limine to exclude any reference to any risk management review or investigation of Barber's injuries by the hospital. Manatee Memorial argued that any suggestion that an investigation would have determined the cause of Barber's injuries was

17

speculation, that whatever it did or did not do after the fact was irrelevant, and that this is not a res ipsa loquitur case.

In response, Barber argued that after he inexplicably suffered bilateral hip fractures during his stay in the hospital for an overdose, Manatee Memorial disregarded its own policies by not investigating how the injuries occurred. Barber told the court that he did not want to introduce the lack of investigation as evidence of Manatee Memorial's negligence but rather wanted to use it to establish his res ipsa loquitur claim.

The trial court granted the motion finding that any lack of investigation or evidence of an insufficient investigation was not relevant to whether Barber's injuries were caused by a breach of the standard of care. The trial court indicated that "an after-the-fact attempt to piece together facts and theories to that analysis is generally not admissible" and that it was speculative that an investigation would have revealed the mechanism that caused Barber's injuries or a more specific determination as to how Barber was injured. The court specifically stated at the limine hearing that it was not ruling at that time on whether Barber could avail himself of a res ipsa loquitur theory of negligence.

"[T]he determination of relevancy is within the trial court's discretion." *Healthcare Underwriters Grp., Inc. v. Sanford*, 337 So. 3d 32, 41 (Fla. 4th DCA 2022). Here, because the trial court reserved ruling on whether Barber could base his negligence claim on res ipsa loquitur, its determination that evidence of Manatee Memorial's failure to investigate his injuries was irrelevant was an abuse of discretion.

In order to argue res ipsa loquitur, Barber must be able to establish a lack of available evidence surrounding the events that led to his

18

injuries.  *See* Fla. Std. Jury Instr. (Civil) 402.4(e) ("If you find that ordinarily the [incident] [injury] would not have happened without negligence, and that the (describe the item) causing the injury was in the exclusive control of (defendant) at the time it caused the injury, you may infer that (defendant) was negligent *unless, taking into consideration all of the evidence in the case*, you find that the (describe event) was not due to any negligence on the part of (defendant).").  Manatee Memorial's failure to investigate the incident is therefore relevant.  *See* § 90.401, Fla. Stat. (2022) ("Relevant evidence is evidence tending to prove or disprove a material fact.").  Additionally, the lack of investigation weakens Manatee Memorial's argument that Barber's injuries were the result of an undocumented violent tonic-clonic seizure and establishes the limited foundation for the hospital's expert witnesses' opinions.  And the trial court can appropriately instruct the jury that Manatee Memorial's failure to investigate should be considered only for the purposes of demonstrating a lack of evidence surrounding the cause of Barber's injuries and not as evidence of the hospital's negligence.

CONCLUSION

We reverse the entry of the final summary judgment and remand this matter for further proceedings, during which Barber may introduce evidence of Manatee Memorial's failure to investigate how he sustained bilateral hip fractures while he was being treated for a drug overdose at Manatee Memorial.

Reversed and remanded for further proceedings.

ROTHSTEIN-YOUAKIM and LABRIT, JJ., Concur.

———————————————

Opinion subject to revision prior to official publication.

19